# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| PHILLIP LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 04-CV-152 |
| v. | ) | (DNH/RFT) |
| | ) | |
| WILLIAM BONANNI and | ) | |
| CITY OF ALBANY POLICE DEPARTMENT, | ) | Honorable David N. Hurd |
| | ) | United States District Judge |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WILLIAM BONANNI'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

GETNICK LIVINGSTON ATKINSON
GIGLIOTTI & PRIORE, LLP
Patrick G. Radel, Esq., of Counsel
Bar Roll No: 512794
Attorneys for Plaintiff Phillip Lewis
258 Genesee Street, Suite 401
Utica, New York   13502
Telephone (315) 797-9261

## I. INTRODUCTION

Plaintiff Phillip Lewis, by and through his attorneys of record, Getnick Livingston Atkinson Gigliotti & Priore, LLP, hereby submits this memorandum of law in opposition to the motion by Defendant William Bonanni for Judgment as a Matter of Law or for a New Trial. (Docket No. 167).

For the reasons set forth herein, it is respectfully submitted that Defendant Bonanni's motion should be denied in all respects.

## II. BACKGROUND

**A.    FACTS**

This memorandum of law was prepared without the benefit of the trial transcript, which has not been provided to any of the parties as of the date hereof. The facts as set forth below are based upon the undersigned's recollections, the trial exhibits, and/or contemporaneous trial notes. Plaintiff hereby reserves the right to supplement, amend, and/or expand upon the points raised herein after the trial transcript has been provided and reviewed.

On the night of November 23, 2002, Plaintiff Phillip Lewis, an African-American man, was arrested outside of a residence located at 195 Livingston Avenue in the City of Albany, New York. Albany Police Department records admitted into evidence at trial identified Defendant William Bonanni as the "arresting officer." Plaintiff testified that he was visiting the mother of his children at her residence at 195 Livingston Avenue on the night in question. Plaintiff and the woman had a disagreement, after which he left the residence for a brief period of time.

Upon returning to the area outside of 195 Livingston Avenue, Plaintiff was approached and surrounded by numerous armed police officers employed by the City of Albany Police Department.

1

After some initial confusion, Plaintiff laid down on the ground voluntarily, as directed by the police, whereupon he was handcuffed and placed face down.  After a "pat down" search was conducted, Plaintiff had a conversation with Defendant William Bonanni, one of the Albany police officers, concerning an unemployment check found in Plaintiff's pocket.  During the course of that conversation, Plaintiff made a smart remark to Defendant Bonanni.

Moments later, as Plaintiff lay on the ground handcuffed and helpless, Defendant Bonnani, along with another officer, brutally assaulted Plaintiff by standing on the back of his head and grinding his face into the asphalt.  Defendant Bonanni first placed one foot and then both of his feet onto the back of Plaintiff's head and yelled "weee!" as he ground Plaintiff's face into the pavement like a cigarette butt.  Bits of rock and asphalt became embedded in the side of Plaintiff's face as his skin was scraped away.

Plaintiff, unable to defend himself and experiencing extreme pain, fear, and humiliation, begged and screamed for Defendant Bonanni to "get off."  Defendant Bonanni eventually discontinued the assault, bent down, looked directly at Plaintiff, and smirked at him.

Following his arrest, Plaintiff was transported to a police station for booking. He was then taken to Albany Memorial Hospital, where he was treated by Dr. Linda Olsen in the emergency room.  The medical records introduced into evidence at trial demonstrated that Plaintiff was diagnosed as having sustained a closed head injury, facial abrasion, and facial contusion.  According to the medical records, Plaintiff complained of severe facial pain and headaches.  Plaintiff's wound was cleaned and treated with antibiotics. He was then given closed head injury instructions and discharged to police custody.

Plaintiff testified that his face was swollen and extremely painful for several months after the

arrest.  He further testified that he experienced difficulty sleeping for nearly a year, with his sleep interrupted by frequent nightmares related to the assault and, in particular, nightmares in which he recalled Defendant Bonanni standing on top of his head and then bending down and smirking at him.

In addition to the foregoing, evidence of Defendant Bonanni's prior conduct was admitted pursuant to Rule 404 (b) of the Federal Rules of Evidence was admitted on the questions of identity, motive, and intent.

Internal police department records regarding civilian excessive force complaints (the "prior complaints evidence") revealed that every complaint filed against Defendant Bonanni involved an African-American suspect. This was notable given Defendant Bonanni's testimony that 65% of persons that he arrested were African-American, but 100% of the complaints were from African-Ameicans.  Moreover, the prior complaints evidence established a *modus operandi*, whereby Defendant Bonanni would lash out at African-American suspects whenever he felt his authority had been questioned or challenged, striking the handcuffed suspect in the head.

## B.    PROCEDURAL HISTORY

This Court is well-acquainted with the procedural history of this case, which has been set forth in prior pleadings, including Plaintiff's trial memorandum (Docket No. 107), which is hereby incorporated by reference.

This case was tried to a jury of eight members in Utica, New York on February 25, 26, and 27, 2008.  At the conclusion of the trial, the jury rendered a verdict finding Defendant Bonanni liable for excessive force and equal protection violations and concluding that the Defendant City was liable for having failed to properly train, supervise, and/or discipline Defendant Bonanni.  The jury

awarded $65,000 in compensatory damages and concluded that punitive damages should be awarded against Defendant Bonanni.

The jury reconvened on March 6, 2008, heard further arguments from counsel on behalf of Plaintiff and Defendant Bonanni, and then deliberated regarding the amount of punitive damages, after which the jury awarded $200,000 in punitive damages against Defendant Bonanni.

### III. ARGUMENT

**A.     LEGAL STANDARD**

Presently before this Court is a motion by the Defendant William Bonanni seeking an order overturning the jury's verdict and entering judgment as a matter of law in favor of defendants pursuant to Rule 50 (b) of the Federal Rules of Civil Procedure or, in the alternative, granting a new trial under Rule 59.

**1.     Rule 50 (b) Standard**

The standard of review with respect to a Rule 50 (b) motion is well-settled and has been articulated as follows:

"In considering a motion for judgment as a matter of law, the district court '*must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence* .'" Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007) (emphasis in original) (quoting Reeves v. Sanderson Plumbing, 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. "Thus, although the court

should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." Id. (emphasis in original).

Accordingly, "a court may grant a motion for judgment as a matter of law 'only if it *371 can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'" Id. at 370-71 (emphasis in original) (quoting Piesco v. Koch, 12 F.3d 332, 343 (2d Cir.1993)). Moreover, "[i]n ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony." Zellner, 494 F. 3d at 371 (citing Haywood v. Koehler, 78 F.3d 101, 105 (2d Cir.1996) (jurors are "free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[ ]")).

### 2.    Rule 59 Standard

The Second Circuit has held that, in determining whether to order a new trial pursuant to Rule 59 of the Federal Rules of Evidence on the ground that a verdict is against the weight of the evidence:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978).

### B.    RESPONSE TO POINT I-THE DAMAGES AWARDED WERE REASONABLE

"It is well settled that calculation of damages is the province of the jury." Blissett v. Coughlin, 66 F.3d 531, 536 (2d Cir. 1995). The Second Circuit has held that "[t]he standard of appellate review

of damage awards, whether compensatory or punitive, 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" Id. (quoting Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990)).

"[C]onsiderable deference" is accorded to "the factual findings of both judge and jury regarding damages" and the jury is entitled to credit the plaintiff's testimony concerning the nature and extent of his or her injuries.  Id.  The courts consider damage awards in similar cases to assess the propriety of the jury's award in the case at bar.  Id.  However, this analysis should not necessarily be limited to federal civil rights cases and may include similar state court cases.  See Ismail, 899 F.2d at 186 (holding  that "district court . . . improperly limited its frame of reference to federal § 1983 cases").

**1.    The Jury's Compensatory Damages Award does Not "Shock the Conscience"**

A review of similar cases, including state court cases, indicates that the jury's award of $65,000 in compensatory damages does not shock the judicial conscience and should accordingly be afforded considerable deference.

As a threshold matter, it must be noted that, in considering the awards sustained in cases decided years ago, it is both necessary and appropriate to update and adjust the monetary awards upward to reflect inflation. See Martinez v. Port Authority of New York & New Jersey, No. 01 Civ 721, 2005 WL 2143333, at *20 n. 9 (Sep. 2, 2005) (noting that "in comparing a ten-year old award to the jury's actions in this case, there should be some upward adjustment for inflation  . . . .").

**a.    Review of Similar Cases**

In Mendoza v. City of Rome, 872 F. Supp. 1110, 1126 (N.D.N.Y 1994), this Court reduced

a compensatory damages award of $200,000 to $62,500 ($89,276.74 in 2008 dollars).[1] The evidence presented concerning the plaintiff's damages in <u>Mendoza</u> may be summarized as follows: during the arrest, the plaintiff "sustained a bruise and swelling of his right knee, a bruise to his forehead, red marks to his wrists, numbness of the hands, and headaches." <u>Id.</u> at 1120. None of the injuries were permanent and the medical treatment consisted of x-rays and ace bandages. The plaintiff had a pre-existing knee problem, which was unaffected by the arrest. "All of the physical injuries dissipated within a few weeks after the assault." <u>Id.</u> The plaintiff also testified that he suffered shame, humiliation, and embarrassment. <u>Id.</u> at 1120-21.

In <u>Nash v. Sue Har Equites, LLC</u>, 846 N.Y.S 2d 215, 216 (1st Dep't 2007), the Appellate Division, Second Department, reduced an award of $190,000 to $100,000, finding that anything above the latter amount exceeded reasonable compensation. The plaintiff "suffered pain to his head and a laceration requiring several stitches." <u>Id.</u> at 216. The plaintiff's claim for damages was not supported by any expert testimony or medical evidence. <u>Id.</u>

In <u>Morales v. City of New York</u>, No. 99 Civ 10004, 2001 WL 8594, at *7 (S.D.N.Y. Jan. 2, 2001), the plaintiff's "physical injuries were limited to deep bruises." She "required no serious medical treatment; her bruises soon healed; and she sustained no permanent physical injury." <u>Id.</u> Notably, the plaintiff had no recollection of "force being used wantonly, maliciously, or even unnecessarily." <u>Id.</u> Although the plaintiff offered expert testimony concerning post traumatic stress disorder, this testimony was discounted by the court, which concluded that the post traumatic stress

---

[1]This adjusted amount was reached using the tool provided by the United States Bureau of Labor Statistics on its website: <u>http://data.bls.gov/cgi-bin/cpicalc.pl.</u> Other district courts have used the same tool to adjust jury awards when comparing prior awards to the verdict under view. <u>See</u>, <u>e.g.</u> <u>Martinez</u>, 2005 WL 2143333, at *20 n. 9; <u>Scott v. John Doe Corp.</u>, No. 01-CV-5910, 2006 WL 2335542, at *3 n.3 (E.D.N.Y. Aug. 10, 2006).

was caused by the arrest itself, rather than the excessive use of force.  As such, the court concluded that an award of $50,000 ($59,766.52 in 2008 dollars) was the maximum allowable amount because there was "virtually no evidence of a beating, . . . the plaintiff suffered only bruises, and . . . the plaintiff's much more severe emotional trauma was due principally to a lawful arrest and [was] therefore not compensable." Id. at *10.

In Bender v. City of New York, 78 F.3d 787, 792 (2d Cir. 1996), the plaintiff's injuries were described as follows: "a physical blow to the mouth that resulted in no bruise or cut, much less any permanent injury; 24 hours' confinement in a cell under extremely unpleasant conditions; an additional five hours of custody prior to release at arraignment; the pendency of disorderly conduct and assault charges for six months, prior to their dismissal; and emotional distress to the plaintiff that was manifested by nightmares and occasional loss of sleep over a period lasting a year and a half." Although the plaintiff offered expert testimony regarding her emotional distress, the Second Circuit discounted that testimony, noting that "the basic facts are that she was in custody for one day, the experience caused her some emotional distress, and she suffered no permanent disability." Id. Accordingly, the Second Circuit reduced the award of compensatory damages to $150,000 ($202,383.37 in 2008 dollars). Id. at 795.

A jury verdict of $250,000 was reduced to $150,000 ($178,508.89 in 2008 dollars) in Becker v. City of New York, 745 N.Y.S.2d 857 (N.Y. City Civ. Ct. 2002), where the plaintiff sustained lacerations and contusions to his face and head, which required stitches and left a scar on his nose. The plaintiff also testified that he suffered humiliation and fright.

Lastly, in Bert v. Port Authority of New York and New Jersey, 561 N.Y.S. 416, 416-17 (1st Dep't 1990), the Appellate Division upheld an award of $100,000 ($161,968.63 in 2008 dollars) in

compensatory damages in a case where there was no claim for lost earnings and no evidence of "any substantial mental or physical injury." Noting that the incident in question "had racial overtones," the court held that the award was reasonable given the "abject humiliation" suffered by the plaintiff and the resulting impact upon his family.

### b.    Evidence Concerning Damages

It is well-settled that compensatory damages for emotional pain and suffering may be recovered in § 1983 actions. See Dejesus v. Vill. of Pelham Manor, 282 F. Supp. 2d 162, 177 (S.D.N.Y. 2003) ("It is a basic tenant of civil rights law that compensable injuries may include not only monetary losses such as out-of-pocket expenses, but also injuries such as personal humiliation and mental anguish.") (citing Walz v. Town of Smithtown, 46 F.3d 162, 169-170 (2d Cir. 1995)); see also Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 907 (2d Cir. 1993) ("It is axiomatic that civil rights plaintiffs may recover compensatory damages for emotional distress.").

In the present case, as noted above, Phillip Lewis testified that Defendant Bonanni stood on top of head and ground his face into the pavement like a cigarette butt. Plaintiff testified that this caused him extreme physical pain, as the pebbles and asphalt from the road were ground into the side of his face and, at one point, the full weight of Defendant Bonanni's body was pressed into Plaintiff's head. In addition to the tremendous pain, Plaintiff's testimony indicated that the assault was extremely traumatic, degrading, and humiliating.

Defendant Bonanni states that the evidence regarding Plaintiff's injuries was limited to Plaintiff's testimony. This is false. To wit, the injury to Plaintiff's face was documented in a photograph admitted into evidence. Although taken several hours after the injury and after the wound had been treated with ice and cleaned, the photograph nevertheless reveals the large contusion and

a significant scraping away of skin from Plaintiff's face.  The jury was certainly well within its discretion to consider that photographic evidence, along with Plaintiff's testimony, when determining the nature and extent of the injuries and the amount of pain and suffering likely to have been caused by said injuries.

Moreover, further evidence supporting Plaintiff's injuries was provided in the form of medical records and testimony from Dr. Linda Olsen, the emergency room doctor who treated Plaintiff on the night in question.   The medical records prepared by Dr. Olsen indicate that when asked how much pain he was experiencing, Plaintiff responded that it was between a 7 out of 10 and a 10 out of 10.  Upon her examination, Dr. Olsen diagnosed Plaintiff as having a closed head injury, facial abrasion, and facial contusion.  Dr. Olsen testified that she provided closed head instructions in light of the diagnosis, which included instructions that Plaintiff be monitored carefully due to the injury that he sustained to his head.  Dr. Olsen further testified that a facial abrasion is a scraping away of the skin from the face, which can be extremely painful.

Plaintiff testified that his face was swollen and extremely painful for several weeks after the assault.  He further testified to experiencing severe headaches and significant difficulty sleeping for many months thereafter.  Plaintiff provided specific details concerning nightmares that he suffered, which nightmares involved visions of Defendant Bonanni standing on his head and smirking at him.

Upon information and belief, the assertion by Defendant Bonanni's counsel in the supporting memorandum of law that the closed head injury diagnosis is "common" is not supported by any evidence in the record.  Likewise, Defendants offered no evidence at trial to support the suggestion contained in Defendant Bonanni's memorandum of law that Plaintiff's headaches were proximately caused by pre-existing conditions.  Indeed, Plaintiff testified that although he occasionally suffered

headaches prior to the night in question, his headaches were much more frequent and painful in the weeks and months following the assault.

Likewise, Defendant Bonanni's assertion that the emotional distress experienced by Plaintiff was caused by the arrest itself and/or by prior encounters with the police, rather than the brutal assault committed by Defendant Bonanni, is sheer speculation and, indeed, is contrary to the evidence. Plaintiff was not injured during the physical arrest. Rather, the assault and injuries occurred after he had been handcuffed and searched, as he lay helpless on the ground.

The review of similar cases set forth above indicates that an award of compensatory damages in the range between $59,766.52 and $202,383 is reasonable and does not shock the judicial conscience. As such, the jury's award of $65,000 in the present case should be sustained.

By way of specific comparison, in <u>Mendoza</u>, 872 F. Supp. at 1126, this Court found that an award of $89,276.74 (adjusted) would not be considered excessive. In that case, as noted above, the damages were primarily based upon the humiliation and shame inflicted by the assault; none of the injuries were permanent; the medical treatment consisted of x-rays and ace bandages; and all of the physical injuries dissipated within a few weeks after the assault.

Likewise, in <u>Morales</u>, 2001 WL 8594, at *7, a case cited by Defendant Bonanni, the court concluded that $59,766.52 (adjusted) was the maximum allowable award because there was "virtually no evidence of a beating, . . . the plaintiff suffered only bruises, and . . . the plaintiff's much more severe emotional trauma was due principally to a lawful arrest and [was] therefore not compensable."

In the present case, a larger award is justified because there were amble evidence of a beating (*e.g.* the photograph, ER records, and plaintiff's testimony); Plaintiff suffered a closed head injury and facial abrasion in addition to facial contusion; and irrespective of whether the initial arrest was

lawful, the emotional trauma suffered by Plaintiff was attributable solely to an unlawful beating inflicted after he was handcuffed and helpless.[2]

In light of the foregoing and taking into account the considerable deference afforded to the jury's findings, the award of $65,000 in compensatory damages cannot be said to shock the judicial conscience and said award should accordingly be sustained.

### c.    Jury's Conclusion Regarding Causation was Supported by the Evidence.

Defendant Bonanni also suggests that the compensatory damages were excessive because Plaintiff allegedly failed to demonstrate that Defendant Bonanni proximately caused his injuries.  At trial, Plaintiff testified that another police officer (Joseph Shanahan) stood on his head for several seconds, after which point Defendant Bonanni asked if he could "have a turn."  Defendant Bonanni then stood on Plaintiff's head, grinding his face into the pavement.

Defendant Bonanni never requested that the jury be given an opportunity to apportion fault or damages as between himself and Officer Shanahan.  However, Defendant Bonanni now suggests that the jury's award should be reduced because there was no specific evidence as to whether the damages in question were inflicted as a result of his conduct or Officer Shanahan's conduct.

This argument is unavailing for several reasons.  As a threshold matter, Plaintiff is entitled to compensation for the pain, suffering, humiliation, and shame that he endured during the time period when Defendant Bonanni was standing on his head.  Further, Plaintiff testified that his nightmares following the assault specifically included and featured recollections of Defendant

_____

[2]It is noteworthy that Defendant Bonanni described <u>Morales</u> as "factually analogous" to the present case.  Assuming *arguendo* that Defendant Bonanni is correct in this regard, it is unclear why an award of $59,766.52 (adjusted to 2008 dollars) would be reasonable in that "factually analogous" case, but the jury's award of $65,000 in the present case is somehow shocking to the judicial conscience.

Bonanni. Lastly, the jury could have reasonably concluded that Defendant Bonanni either caused the physical injuries sustained by Plaintiff or aggravated injuries initially caused by Officer Shanahan. In either event, Plaintiff was entitled to compensatory damages from Defendant Bonanni and no expert testimony concerning causation was necessary.[3]

The jury was instructed concerning the requirement that Plaintiff establish causation. Defendant Bonanni was given the opportunity to request an amplification and/or modification to that charge if he felt such a modification was necessary. Defendant Bonanni could have, but did not, request an additional charge and/or jury verdict question regarding the portion of fault that might arguably have been assigned to Officer Shanahan. Given the well-established presumption that jurors follow the court's instructions and in light of Defendant Bonnani's failure to request an additional instruction or verdict question regarding causation, there is no reason in law or equity to disturb the jury's finding as to that issue.

In any event and in the alternative, there was no prejudice to Defendant Bonanni because no fair allocation of liability could possibly have been made as between Defendant Bonanni and Officer Shanahan and, as such, both Defendant Bonanni and Officer Shanahan would have been jointly and severally liable for the full amount of damages. See Project Hope v. M/V IBN SINA, 250 F.3d 67, 76 (2d Cir. 2001) ("Where a fair allocation of liability cannot be made among multiple tortfeasors, the federal common law permits imposition of joint and several liability.") (quoting Restatement

---

[3]In Barnes v. Anderson, 202 F.3d 150,159 (2d Cir. 1999), the case cited by Defendant Bonanni in support of his argument, the court ruled that expert medical testimony was required to establish that the plaintiff's miscarriage was proximately caused by the defendant. This ruling was based upon the fact that "miscarriage is the sort of complex injury for which expert medical evidence of causation is required." Id. at 160. In contrast, the injuries at issue in the present case are far from complex and the ordinary juror could certainly determine that the facial abrasions, contusions, etc. were proximately caused by the defendant's booted feet being placed on the back of Plaintiff's head.

13

(Second) of Torts § 879 (1979) ("If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive.")); see also Mazyck v. Long Island R. Co., 896 F.Supp. 1330, 1333 (E.D.N.Y.1995) ("The law is clear that where there is but one indivisible injury caused by the joint or concurrent acts of two [or more] tortfeasors, each tortfeasor is jointly and severally liable for the entire amount of damages.").[4]

In a similar fashion, Defendant Bonanni also suggests that the jury's award may have been "inflated" because the jury was asked to render a single verdict as to damages on all claims against both defendants. Again, Defendant Bonanni was given the opportunity to object to the special verdict form and/or to request that the jury be required to apportion damages or fault among the parties. Having failed to make such a request or objection at trial, Defendant Bonanni should not be permitted to raise the issue now. Moreover, in any event, for the reasons and pursuant to the authority outlined above, both defendants are jointly and severally liable for Plaintiff's injuries. See, e.g., Project Hope, 250 F.3d at 76.

Defendant Bonanni also suggests in passing that some of Plaintiff's injuries may have been caused during a physical altercation that occurred with the mother of his children prior to the arrest. The evidence concerned that alleged altercation was excluded by this Court as far more prejudicial than probative, given the fact that the police officers had no knowledge of the alleged altercation at

---

[4]In this regard, it should be noted that the fact that Officer Shanahan was not included as a defendant in this action is irrelevant. Mazyck, 896 F. Supp. at 1333 n. 2 ("For purposes of this rule, 'it is immaterial whether all or any of [the tortfeasors] are joined as defendants in the particular action.'") (quoting Restatement (Second) of Torts, § 433A cmt. a, at 434 (1965)); Frazier v. Turning Stone Casino, 254 F.Supp.2d 295, 306 (N.D.N.Y. 2003) (noting that "is well-established that generally a tort plaintiff is not required to proceed against all joint tortfeasors but may proceed against one, some or all of them").

the time of the arrest.

Upon information and belief, in the arguments that led to that ruling, Defendant Bonanni never asserted that the evidence concerning the alleged altercation was relevant to the issue of damages. As such, any argument that might have been offered in that regard has been waived. In any event, such an argument could not have been sustained because none of the evidence suggests that Plaintiff's injuries were even remotely caused by or related to the alleged altercation. Any suggestion to that effect constitutes sheer speculation.

2.      **The Jury's Punitive Damages Award does Not "Shock the Conscience"**

Courts will not disturb an award of punitive damages unless the award is so excessive that it "shocks the judicial conscience." Patterson v. Balsamico, 440 F.3d 104, 120. The court's application of this standard is governed by the three "guideposts" articulated by the Supreme Court in BMW of N. America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996): "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." When reviewing a motion challenging a punitive damages award, the court must view the evidence in the light most favorable to the non-moving party. Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir.1993)

The Supreme Court has repeatedly stated that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 1521 (2003) (quoting Gore, 517 U.S. at 575).

Racially motivated assaults are "particularly" reprehensible. Patterson, 440 F.3d at 121.

Moreover, "the Supreme Court has noted . . . that physical assaults generally demonstrate a higher degree of reprehensibility than nonviolent crimes." Id. (citing Gore, 517 U.S. at 575-76). The Second Circuit has "likewise found that whether a defendant's conduct was violent and whether a defendant 'acted with deceit or malice as opposed to acting with mere negligence' are relevant considerations in assessing the reprehensibility of conduct." Id. (citing Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996)).

In addition, "a finding of repeated misconduct," supported by evidence of other excessive force complaints, heightens the reprehensibility and will "support a substantial punitive damage award." Lee, 101 F.3d at 810.

In the present case, Defendant Bonanni's assault on Plaintiff was (i) extremely violent, (ii) utterly unwarranted; (iii) wanton; (iv) malicious; (v) racially motivated; and (vi) the most recent in a series of repeated instances of excessive force. As such, the jury doubtless had little difficulty concluding that Defendant Bonanni's conduct was throughly reprehensible and the evidence supports a substantial punitive damage award.

Further, the punitive damages are approximately three times the amount of the compensatory damages, which is an acceptable ratio. As noted by the Second Circuit in Patterson, "the Supreme Court has upheld a punitive damage award of 'more than 4 times the amount of compensatory damages.'" Patterson, 440 F. 3d at 121 (citing Pac. Mut. Life Ins. Co. v. Hasliip, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L.Ed.2d 1 (1991)); see also  e.g. Mahoney v. Canada Dry Bottling Co. of New York, No. 94-CV-2924, 1998 WL 231082, at *27 (E.D.N.Y. May 7, 1998) (remitting ratio of 19 to 1 to 3 to 1); Greenbaum v. Handelsbanken, 67 F.Supp.2d 228 (S.D.N.Y.1999) (upholding ratio of 3.75 to 1).

16

In sum, given the reprehensibility of Defendant Bonanni's conduct and the ratio between the compensatory and punitive damages, the jury's punitive damages award of $200,000 does not shock the judicial conscience.  See, e.g., Denman v. Sanders, No. 05-Civ-0025, 2006 WL 452018, at *9 (S.D.N.Y. Feb. 24, 2006) (reducing punitive damages award to $200,000 in assault case); Ziemba v. Armstrong, 433 F. Supp. 2d 248, 255-56 (D. Conn. 2006) (finding that punitive damages award of $150,000 did not shock the judicial conscience in § 1983 case involving assault by prison guard).

## C.    RESPONSE TO POINT II-BIFURCATION WAS PROPERLY DENIED

Prior to trial, the Defendant City of Albany Police Department moved for bifurcation pursuant to Rule 42 (b) of the Federal Rules of Civil Procedure. (Docket No. 93).  Defendant William Bonanni did not file his own motion, but did submit a memorandum of law in support of the City's motion. (Docket No.95).  This Court denied the motion in a ruling delivered from the bench on January 25, 2008, which ruling was memorialized in an Order entered on that same date.  (Docket No. 104).

Defendant Bonanni contends that bifurcation was improperly denied and, as such, the jury's verdict should be overturned and/or a new trial should be granted.  For the following reasons, this Court's denial of the bifurcation motion was entirely proper and in accord with applicable law.

Although Rule 42 (b) of the Federal Rules of Civil Procedure permits bifurcation of claims into separate trials, the decision as to whether to grant such relief is left to the broad discretion of the district court. Jeanty v. County of Orange, 379 F. Supp.2d 533, 549 (S.D.N.Y. 2005) (citing Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999)).

It is well-settled that "the moving party has the burden of justifying bifurcation, and separate trials are the exception rather than the rule." DeVito v. Barrant, No. 03-CV-1927, 2005 WL 2033722,

at *11 (E.D.N.Y. Aug. 23, 2005); see also Thrower v. Pozzi, No. 99 Civ. 5871, 2002 WL 91612, at

*5 (S.D.N.Y. Jan. 24, 2002) ("Regardless of the latitude given to district courts in their decision to

bifurcate trials, separate trials remains the exception, rather than the rule.").

Moreover, "the presumption is that all claims in a case will be resolved in a single trial, and

'it is only in exceptional circumstances where there are special and persuasive reasons for departing

from this practice that distinct causes of action asserted in the same case may be made the subject of

separate trials.'" Jeanty, 379 F. Supp. 2d at 549 (quoting Lewis v. Triborough Bridge and Tunnel

Auth., No. 97 Civ. 0607, 2000 WL 423517, at *2 (S.D.N.Y. April 19, 2000) (quoting Miller v. Am.

Bonding Co., 257 U.S. 304, 307, 42 S.Ct. 98, 66 L.Ed. 250 (1921)).

In the present case, Defendant Bonanni claims that he was unfairly prejudiced because the

prior complaints evidence improperly inflamed and tainted the jury.  This argument rests upon two

assumptions: (1) that the prior complaints evidence was not a proper matter for the jury to consider

in determining the excessive force and equal protection claims against Defendant Bonanni and (2)

that the jury would have found in favor of Defendant Bonanni in the absence of the prior complaints

evidence.  For the following reasons, both of these assumptions are false.

**1.    Prior Civilian Complaints Evidence was Admissible under Rule 404(b)**

Rule 404 (b) of the Federal Rules of Evidence provides, in pertinent part, that evidence of

other crimes, wrongs, and acts is admissible to prove, *inter alia*, motive, intent, and identity.  Under

the Second Circuit's "inclusionary approach," prior bad acts evidence may be admitted under Rule

404 (b) "can be admitted 'for any purpose other than to show a defendant's criminal propensity.'"

United States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003).

### a. Admissibility of Evidence Regardless of Investigation Results

Defendant Bonnani argues that certain of the prior complaints should have been excluded because either (i) the complaint was determined to be "unfounded" or (ii) there is no indication in the record as to how the complaint was resolved. However, neither of these factors precluded admission of the evidence in question and all of the prior complaints were properly admitted.

It is well-settled that when considering evidence of alleged prior bad acts under 404 (b), "[c]ourts need not make a preliminary finding that a defendant has committed the other alleged acts." Eng v. Scully, 146 F.R.D. 74, 80 (S.D.N.Y. 1993) (citing Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); see also Ismail, 706 F. Supp. at 253 ("No preliminary finding by the district court that the defendant committed the other act is required. No criminal conviction, civil judgment, administrative finding, or even preliminary judicial finding is necessary before specific acts of other misconduct may be introduced as extrinsic evidence under Rule 404(b) to prove wrongful intent, motive, or pattern of relevant conduct . . . or an 'aggravated state of mind.'") (internal citations omitted).

As explained by the court in Eng, "[i]t does not matter that [the defendant was] not convicted of using excessive force nor found to have done so by a judicial or administrative body. Where malicious, aggravated conduct is purportedly involved, reports of this type are admissible." Eng, 146 F.R.D. at 80.

Accordingly, all of the prior complaints were admissible against Defendant Bonnani under 404 (b) as relevant to the issues of intent, motive, and identity.

### b. Motive and Intent

Rule 404 (b) of the Federal Rules of Evidence provides, in pertinent part, that evidence of

19

other crimes, wrongs, and acts is admissible to prove, *inter alia*, motive, intent, and identity.  Under

the Second Circuit's "inclusionary approach," evidence of prior conduct under Rule 404 (b) "can be

admitted 'for any purpose other than to show a defendant's criminal propensity.'"United States v.

Mitchell, 328 F.3d 77, 82 (2d Cir. 2003).

In the present case, the prior complaints evidence was relevant and admissible to prove

Defendant Bonanni's motive and intent.  In his equal protection claim, Plaintiff alleged that

Defendant Bonanni's use of excessive force was motivated by race.  At trial, Defendant Bonanni

testified that approximately 65% of the suspects that he has arrested were African-American.

However, the evidence revealed that *100%* of the excessive force complaints lodged against

Defendant Bonanni were made by African-Americans.

The fact that not a single excessive force complaint was *ever* filed by a person of any other

race and that *every* complaint involved an African-American was obviously relevant under Rule 404

(b) with respect to the question of Defendant Bonanni's motive and intent, *i.e.* whether he harbored

discriminatory animus toward African-Americans.  See, e.g., Hill v. Taconic Dev. Disabilities Srvs.

Office, 283 F. Supp. 2d 955, 959-60 (S.D.N.Y. 2003) (finding that evidence of past discrimination

was relevant and admissible because proof of such discrimination "might cause a reasonable trier of

fact to conclude that [defendant] harbored discriminatory animus"); Allen v. Perry, 279 F. Supp.2d

36, 46-47 (D.D.C. 2003) (holding that "other acts of discrimination, identical to the kind of

discrimination charged, are admissible under Rule 404 (b) to prove motive or intent").

The relevance of the prior complaints evidence as to motive and intent becomes even clearer

when consideration is given to the fact that, as discussed below, the conduct at issue in the prior

complaints involving African-Americans was strikingly similar to the conduct involving Plaintiff, an

African-American.[5]

### c.    Identity

Often, excessive force claims under § 1983 turn on whether the force used by the defendant police officer was reasonable under the circumstances.  This case was somewhat unusual in that the defendant police officer denied using *any* force and, indeed, denied that he was the officer who caused the Plaintiff's injuries or performed the actual arrest.  As such, the issue of identity was central to the Plaintiff's excessive force claim.

It is well-settled that evidence of prior conduct is admissible under Rule 404(b) with respect to the issue of identity.  Typically, such evidence is admitted on the question of identity where the defendant exhibits a particular *modus operandi*, *i.e.*, when the "other acts . . . show a pattern of conduct [and] . . . share 'unusual characteristics' with the act charged or represent a 'unique scheme'" Valenzuela v. Abate, No. 92 Civ. 9309, 1996 WL 22373, at *2 (S.D.N.Y. Jan. 22, 1996); see also Youngblood v. Brown, 465 F. Supp.2d 270, 280 (S.D.N.Y. 2006) (finding that evidence of prior uncharged crimes was admissible because it demonstrated "unique *modus operandi* and was thus relevant to establishing defendant's identity as the perpetrator").

In the present case, given the striking similarity between the conduct at issue in the instant case and the conduct alleged in the prior complaints, the evidence was properly admitted under 404(b) to show identity.

---

[5]In addition and in the alternative, courts in this Circuit have held that prior, similar complaints are admissible as evidence that the defendant officer had "a pattern of lashing out physically when he feels his authority is challenged by a citizen with whom he is dealing on the street."Ismail, 706 F. Supp. at 253; Eng v. Scully, 146 F.R.D. 74, 80 (S.D.N.Y. 1993) ("A plaintiff in an excessive force case is entitled to prove by extrinsic evidence of other instances that the police officer defendant acted 'maliciously and sadistically for the very purpose of causing harm.'"); see also O'Neill v. Krzeminski,  839 F.2d 9, 11 n. 1 (2d Cir. 1988) (comment by Newman, J).

For example, all of the complaints involved allegations of excessive force against African-American suspects. At least four (4) of seven (7) prior complaints (McLune, Mackey, Neil Williams, Henderson) included allegations that the African-American suspect was kicked in the head while handcuffed, which is precisely the type of excessive force at issue in this case. Two (2) of the other complaints (Patterson and Morton) included allegations that the African-American suspect was hit in the face or head during an arrest.

At least six of the complaints (Patterson, Mackey, Morton, C. Williams, N. Williams, Henderson) involved allegations that Defendant Bonanni used excessive force after the African-American suspect challenged his authority (*e.g.* by making a "smart remark" or trying to run away), which is entirely consistent with Plaintiff's testimony regarding the circumstances that led to the excessive use of force by Defendant Bonanni on the night in question.

In light of the striking similarity between the conduct at issue and the allegations set forth in the prior complaints, evidence of Defendant Bonanni's prior conduct was clearly admissible under 404(b) as to the issue of identity.[6]

### d.    Probative Value Outweighed the Prejudicial Effect

As set forth above, the prior complaints evidence was admissible under Rule 404(b) with respect to motive, identity, and intent. In addition, this Court properly exercised its discretion under Rule 403 in weighing the probative value of this evidence against its likely prejudicial effect.

The evidence was highly probative -- it directly related to two of the central issues in the case, namely, whether Defendant Bonanni was the officer who arrested and assaulted Plaintiff (identity)

---

[6]Defendant Bonanni asserts that evidence of perjury charges was improperly admitted into evidence. However, that evidence was only admitted against the Defendant City and this Court provided a limiting instruction to that effect.

and whether Defendant Bonanni's conduct was motivated by Plaintiff's race (motive and intent). With respect to the question of prejudice, the Defendants were afforded with an opportunity, and did in fact, challenge the prior complaints and argue to the jury that those complaints were unfounded and/or untrue.

In addition, this Court provided carefully crafted instructions to the jury concerning the limited purposes for which the evidence was being admitted, which instructions were sufficient to cure any arguable prejudice. <u>Jeanty</u>, 379 F. Supp.2d at 549; <u>Ingles</u>, 2005 WL 1354028, at *1; <u>Ismail</u>, 706 F. Supp. at 253.

### 2.    Any Alleged Error was Harmless

In addition and in the alternative, even assuming *arguendo* that the trial should have been bifurcated and/or that the prior complaints evidence should not have been admitted against Defendant Bonanni, the defendants cannot show any prejudice arising out of those alleged evidentiary errors.

Rule 61 of the Federal Rules of Civil Procedure provides, in pertinent part, that:

> Unless justice requires otherwise, no error in admitting or excluding evidence — or any other error by the court or a party — is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61.

In accordance with Rule 61, the Second Circuit has held that a district court's evidentiary rulings will not be disturbed unless they are "manifestly erroneous." <u>Luciano v. Olsten Corp.</u>, 110 F.3d 210, 217 (2d Cir. 1997).

Moreover, a new trial should not be granted unless "the introduction of inadmissible evidence was a clear abuse of discretion and was so *clearly prejudicial* to the outcome of the trial that we are

23

'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Id. (emphasis added) (quoting Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir.1992). Prejudice is measured by assessing the alleged error "in light of the record as a whole." Luciano, 110 F.3d at 217; cf. Tesser v. Bd of Educ. of City School Dist. of City of New York, 370 F.3d 314, 319 (2d Cir. 2004) (holding that "an evidentiary error in a civil case is harmless 'unless [the appellant demonstrates that it is likely that in some material respect the factfinder's judgment was swayed by the error.'"

In the present case, even if the prior complaints evidence had been excluded, there was ample evidence in the record to support the jury's finding that Defendant Bonanni used excessive force against the Plaintiff. In other words, even if one were to exclude the prior complaints evidence and consider only the remaining evidence, defendants cannot establish the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice.

First, the Plaintiff testified clearly and unequivocally about the brutal assault committed by Defendant Bonanni while Plaintiff was handcuffed and helpless on the ground. The jury, having had the opportunity to observe Plaintiff's demeanor, found that portion of his testimony to be credible and that credibility assessment should not be disturbed.

Second, the arrest report clearly identified Defendant Bonanni as the "arresting officer." Robert Wolfgang, who was Chief of Police at the time the report was prepared, testified that "more often than not," the arresting officer is the officer who performs the actual, physical arrest. This powerful piece of documentary evidence provided substantial support for Plaintiff's testimony and it is likely that Defendant Bonanni's attempts to distance himself from the plain language of the arrest report seriously damaged his credibility with the jury.

Third, the defendants called four (4) police officers (including Defendant Bonanni) to testify regarding the events surrounding Plaintiff's arrest. However, the testimony of the various defense witnesses was inconsistent and, indeed, directly contradictory with respect to a number of material facts.

For example, Officer Lawrence Heid testified that Plaintiff refused to lay down on the ground. Officer Heid further explained that he had to put his knee into Plaintiff's back to get him to lay down. According to Officer Heid, Plaintiff was likely injured during this "put down." In direct contrast, Officer Joseph Shanahan testified that he unequivocally recalled that Plaintiff laid down on the ground "on his own" and that Plaintiff was injured later when the officers were attempting to apply handcuffs. Sargent Joseph Pickel then testified that Plaintiff was injured when Officer Shanahan "tackled" him to the ground, testimony directly at odds with the unequivocal, sworn testimony provided to the jury by Officer Shanahan moments earlier.

The inconsistencies and contradictions between and among the defense witnesses certainly damaged the credibility of those witnesses with the jury and, concomitantly, enhanced the credibility of Plaintiff's testimony concerning the events of the night in question and, specifically, the manner in which he sustained his injuries.

Fourth, the medical and photographic evidence contradicted the testimony of several of the defense witnesses, who repeatedly described Plaintiff's injuries as a "little scrape" and/or otherwise characterized the injuries as "minor." Certainly, based upon the hospital records and upon viewing the photograph, the jury could have found the Plaintiff's testimony concerning his injuries vastly more credible than the testimony offered on behalf of the defense.

In sum, Defendant Bonanni's argument implies that no reasonable trier of fact could have

concluded that excessive force was used absent the alleged "inflammatory effect" of the prior complaints evidence. This assertion is false. The prior complaints evidence was, obviously, persuasive proof with regard to the matters at issue. For the reasons outlined above, that evidence was properly submitted for the jury's consideration, accompanied by appropriate limiting instructions. However, the suggestion that the prior complaints evidence was the *only* persuasive evidence supporting the excessive force claim is simply not true. As noted above, Plaintiff's testimony regarding Defendant Bonanni's assault was supported by the medical evidence and police report prepared contemporaneously with the arrest. Moreover, Plaintiff's credibility was enhanced by his own testimony, particularly when compared with the contradictory, inconsistent, and incredible testimony offered on behalf of the defense.

In light of the foregoing, even assuming *arguendo* that the prior complaints evidence should have been excluded, the defendants cannot show any prejudice arising out of that alleged error, as required under applicable law to justify the extraordinary remedy of overturning the jury's verdict.

**D.     RESPONSE TO POINT III-QUALIFIED IMMUNITY WAS NOT AN AVAILABLE DEFENSE GIVEN THE FACTUAL ISSUES**

As noted above, this case presented a somewhat atypical scenario in that the primary focus of debate was not whether the amount of force used was reasonable, but whether Defendant Bonanni used any force at all. The defense witnesses uniformly denied that Defendant Bonanni had any physical contact with Plaintiff.

At no time did any of the defense witnesses suggest that the circumstances would have even arguably permitted Defendant Bonanni or any other police officer to stand on Plaintiff's head and grind his face into the pavement. Indeed, such conduct, if proven, constitutes excessive force in

26

violation of the Fourth Amendment as a matter of law. See e.g., Johnson v. City of New York, No. 05-CV-2357, 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (noting that "[w]hile not every push or shove violates the Fourth Amendment, ... there surely would be no objective need to 'stomp' and 'kick' an individual already under police control"); Pierre-Antoine v. City of New York, No. 04-CV-6987, 2006 WL 1292076, at *4 (S.D.N.Y. May 9, 2006) (finding that repeatedly striking individual who had been subdued by police would constitute objectively unreasonable use of force under the Fourth Amendment); Graham v. Springer, No. 03-CV-6190, 2005 WL 775901, at *6 (W.D.N.Y. Apr. 5, 2005) (denying summary judgment because plaintiff's evidence indicated that he was kicked while lying on the ground in handcuffs); Jones v. Ford, No. 00-CV-0934, 2002 WL 1009733, at *4 (M.D.N.C. Feb. 15, 2002) ("If Defendant ... did in fact kick Plaintiff several times while he was on the ground handcuffed, such acts could constitute excessive force in violation of the Fourth Amendment.").

Under these circumstances, the jury was either going to believe the defense testimony that Defendant Bonanni never made physical contact with the Plaintiff or it was going to credit the evidence submitted by Plaintiff regarding the assault.

Under the former scenario, the defense of qualified immunity would have been irrelevant because the jury would have found that no force was used at all. Under the latter scenario, the qualified immunity defense was unavailable because standing on a handcuffed suspect's head constitutes a clear Fourth Amendment violation of which any reasonable police officer would be aware. Cf. Merced v. Moylan, No. 05-CV-1426, 2007 WL 3171800, at *10 (N.D.N.Y. Oct. 29, 2007) ("Attacking a handcuffed prisoner and causing injury, without provocation, constitutes a clear Eighth Amendment violation of which a reasonable person should have known. Defendant Moylan is

therefore not entitled to qualified immunity.")

Accordingly, this Court's refusal to charge the jury on the question of qualified immunity was proper and does not justify the granting of a new trial.

### E.    THE JURY'S VERDICT AS TO THE EQUAL PROTECTION CLAIM WAS SUPPORTED BY THE EVIDENCE

The Second Circuit has held that, in determining whether to order a new trial pursuant to Rule 59 of the Federal Rules of Evidence on the ground that a verdict is against the weight of the evidence:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978).

In the present case, the evidence revealed that 100% of the excessive force complaints filed with respect Defendant Bonanni were filed by African-Americans, even though Defendant Bonanni testified that only 65 % of the people that he arrested were African-American.  The jury could reasonably have afforded great weight to the fact that not even one complaint of excessive force was filed by a non-African-American.

In addition, the majority of the complaints alleged very similar conduct, *i.e.* that Defendant Bonanni kicked or hit the African-American suspect in the head while handcuffed, frequently after the African-American had challenged or questioned Defendant Bonanni's authority.

Moreover, the assault upon Plaintiff was entirely unjustified and without apparent purpose or motivation, which (given the background concerning the prior complaints) could very reasonably lead

28

the jury to conclude that Defendant Bonanni's use of excessive force against Plaintiff was motivated by race.    Given the record evidence, that conclusion can hardly be deemed "seriously erroneous"and/or a "miscarriage of justice."  <u>See</u>, <u>e.g.</u>, <u>Hill</u>, 283 F. Supp. 2d at 959-60 (holding that proof of past discrimination could "cause a reasonable trier of fact to conclude that [defendant] harbored discriminatory animus"); <u>Allen v. Perry</u>, 279 F. Supp.2d 36, 46-47 (D.D.C. 2003) (holding that "other acts of discrimination, identical to the kind of discrimination charged, are admissible under Rule 404 (b) to prove motive or intent").

## IV. CONCLUSION

For the foregoing reasons, it is respectfully requested that the Defendant William Bonanni's Motion for Judgment as a Matter of Law or for a New Trial be denied in all respects.

Dated:    April 4, 2008

Respectfully submitted,

**GETNICK LIVINGSTON ATKINSON
GIGLIOTTI & PRIORE, LLP**

By:    /s/ Patrick G. Radel
          Patrick G. Radel, Esq., of Counsel
          Bar Roll No: 512794
          Attorneys for Plaintiff Phillip Lewis
          258 Genesee Street, Suite 401
          Utica, New York   13502
          Telephone (315) 797-9261

29